IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA       :
                               :
            v.                 :   CRIMINAL ACTION NO.
                               :   1:10-CR-394-SCJ-CCH-1
DANIEL BENAVIDES-GARCIA        :
                               :

### ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the Report and Recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Criminal Local Rules 12.1(E) and 58.1(A)(3).

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and

any appellate review of factual findings will be limited to a plain error review. *United States v. Slay*, 714 F.2d 1093 (11th Cir. 1983).

Pursuant to 18 U.S.C. 3161(h)(1)(D), the above referenced fourteen (14) days allowed for filing objections are **EXCLUDED** from the computation of time under the Speedy Trial Act. At the end of such fourteen-day period, if there are no objections, the Clerk is **DIRECTED** to submit this Report and Recommendation to the District Judge. If there are objections, the other party or parties shall have fourteen (14) days from the filing of those objections to respond, and that fourteen-day period shall also be **EXCLUDED** from the computation of time under the Speedy Trial Act. Thereafter, the Report and Recommendation along with any objections and responses shall be submitted to the District Judge.

After such submission of this Report and Recommendation, whether or not objected to, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time under the Speedy Trial Act the time, up to thirty (30) days, that this Report and Recommendation is under advisement before the District Court. *Henderson v. United States*, 476 U.S. 321, 331 (1986) (the Speedy Trial Act "exclude[s] all time that is consumed in placing the trial court in a position to dispose of a motion.); *United States*

2

*v. Mers*, 701 F. 2d 1321, 1337 (11th Cir. 1983) ("[T]he magistrate and the district court have thirty days each during which to take pretrial motions under advisement.").

IT IS SO ORDERED this 28th day of March, 2011.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA      :
                              :
            v.                :   CRIMINAL ACTION NO.
                              :   1:10-CR-394-SCJ-CCH-1
DANIEL BENAVIDES-GARCIA       :
                              :

## **REPORT AND RECOMMENDATION**

Defendant Daniel Benavides-Garcia is charged in the indictment with one count of conspiracy to distribute a controlled substance (methamphetamine), in violation of 21 U.S.C. §§ 841(b)(1)(A)(viii) and 846, and one count of knowingly and intentionally possessing with the intent to distribute a controlled substance (methamphetamine), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii). This action is before the Court on Defendant's Motion to Suppress Evidence [15] ("Motion to Suppress").

The Court held an evidentiary hearing on Defendant's Motion to Suppress on December 14, 2010, and a transcript of that hearing [22] was filed on January 19, 2011. Thereafter, Defendant filed a post-hearing brief [25] in support of his Motion to Suppress on February 6, 2011, the Government filed a response brief [26] to the Motion to Suppress on February 23, 2011, and Defendant filed a reply brief [27] to

the Government's response on February 25, 2011, at which time the Motion to Suppress became ripe for resolution by the Court. Having heard the evidence and having reviewed the transcript of the evidentiary hearing and the briefs of the parties, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [15] be **DENIED**.

## FINDINGS OF FACT

1.  Detective Miguel Henao is a narcotics detective with the Doraville Police Department and also works as a Task Force Officer with the Drug Enforcement Administration ("DEA"). *See* Transcript of December 14, 2010 Hearing ("T.") at 64.

2.  Detective Henao was involved in a narcotics investigation in or about August 13, 2010, in which he was brought into for the purpose of monitoring phone calls between a confidential source ("CS") and another person. T. at 5.

3.  The law enforcement officers conducting the investigation planned to conduct a "buy bust operation," in which an informant who has contact with a person who is a source of drugs asks the source to bring drugs to a certain location, and

once the drugs are at the location, the officers arrest the person who brought the drugs. T. at 30.

4.    Detective Henao learned during the course of monitoring the phone calls that the CS requested between five and ten pounds of crystal methamphetamine from an individual known as "Gallito" (which means "rooster"), and Gallito agreed to the request and agreed to a meeting location with the CS. T. at 8-9.

5.    The CS and Gallito agreed to meet at the Marriott hotel on Century Boulevard in DeKalb County, Georgia, and the CS gave Gallito a room number at the hotel in which to meet. T. at 5, 6, 10.

6.    Detective Henao, along with some other law enforcement agents, was stationed in a hotel room on the eleventh floor of the Marriott hotel. T. at 5-6.

7.    The CS told the agents that Gallito usually drives an F-150 pickup truck or a black Nissan Altima. T. at 10.

8.    The CS also told the agents that he and Gallito had met at various hotel rooms in the past to conduct drug transactions. T. at 10-11.

3

9.      Around 3:30 in the afternoon, Gallito called the CS and said, "hey, I should be there shortly. I should be there [in] around twenty minutes," and Gallito asked the CS for specific directions to the hotel. T. at 11.

10.     The conversation between Gallito and the CS took place in Spanish, and Detective Henao is a native Spanish speaker. T. at 5, 11.

11.     Detective Henao translated the phone call to another agent that was in the hotel room with him, and that agent relayed the information via radio to the surveillance units. T. at 12.

12.     From his location inside the hotel room on the eleventh floor of the Marriott hotel, Detective Henao could see the entire parking lot of the hotel out the window. T. at 12.

13.     According to Detective Henao, the traffic that was entering and exiting the parking lot that day was slow, so slow that the agents were able to observe each vehicle and identify the driver and passengers of each vehicle, and observe whether they were checking into the hotel or just parking the vehicles and walking in. T. at 13-14.

14.    According to Detective Henao, at or around 3:40 p.m., or sometime after that, there was a phone call between the CS and Gallito in which the CS asked Gallito "are you here?" and Gallito responded, "I should be there in a little bit." T. at 12.

15.    At or around the time of that phone call, Detective Henao noticed a green Nissan Altima enter the parking lot of the Marriott hotel. T. at 12-13.

16.    Detective Henao testified that he watched the Altima enter the hotel parking lot, drive through the parking lot "real slow," make a U-turn, slow down even more, and then exit the parking lot. T. at 13.

17.    When Detective Henao translated the latest phone call between the CS and Gallito to the agent in the hotel room with him, and told the agent about the vehicle in the parking lot, the agent relayed that information to the surveillance units. T. at 13.

18.    Trooper First Class Chris Carlisle of the Georgia State Patrol works on a criminal interdiction unit that assists the DEA as well as other law enforcement agencies, and he was also involved in the same narcotics investigation that was conducting the buy-bust operation. T. at 17-19.

19.    On August 13, 2010, Trooper Carlisle was stationed in his patrol vehicle in the
       parking deck across the street from the Marriott hotel. T. at 19.

20.    Trooper Carlisle heard over the radio that a Nissan Altima rode through the
       parking lot and one of the agents said he was going to follow it. T. at 20.

21.    Trooper Carlisle then drove his patrol car behind the agent who was following
       the Altima, and followed them into a residential area. T. at 20.

22.    By the time Trooper Carlisle reached the Altima, Agent Ron Skipper had
       already pulled the Altima over, removed the driver from the vehicle, and
       handcuffed the driver. T. at 21-22, 25.

23.    Task Force Agent Ron Skipper works for the DEA Atlanta OCDETA Strike
       Force One and he also participated in the buy-bust operation on August 13,
       2010. T. at 28-30.

24.    According to Agent Skipper, the area around the Marriott hotel is populated by
       a lot of Hispanic people. T. at 45.

25.    Agent Skipper was not driving a marked vehicle at the time, and his role was
       to block one of the driveways of the Marriott hotel at Century Plaza. T. at 30.

26.   According to Agent Skipper, he obtained information over the radio that someone had seen a green Nissan Altima enter the hotel parking lot that appeared to be driven by a Hispanic male. T. at 31.

27.   Agent Skipper then observed the Altima turning left in front of the hotel, traveling very slowly, and when he observed the Altima turn out of the hotel and onto Century Boulevard, he followed it on Century Boulevard. T. at 32.

28.   Agent Skipper then called out the tag number on the vehicle over the radio, and was informed that the vehicle was registered to a Hispanic male. T. at 33.

29.   According to Agent Skipper, the Altima was traveling "very slowly, much slower than the rest of the traffic, probably 10 or 15 miles an hour." T. at 33.

30.   Because the Altima was traveling so slowly, Agent Skipper decided that he would have to pass the Altima because it would have been obvious that he was following the Altima if he had stayed behind him, and he let the other agents know over the radio that he would be passing the Altima. T. at 33.

31.   As Agent Skipper passed the Altima, he looked at the driver, and gave the description of the driver of the Altima over the radio as a young light-skinned

Hispanic male with a white t-shirt and a short, but not overly short, haircut. T. at 33.

32.   Agent Skipper was then advised by agents over the radio that the CS confirmed that the description of the driver of the Altima matched the description of the person he had spoken to over the telephone and was expecting to deliver the drugs to the hotel room. T. at 33-34.

33.   Agent Skipper then observed the Altima pull up beside his vehicle on Century Boulevard at a red light at the intersection with Clairmont Way, and noticed that the Altima had his left turn signal on. T. at 34-35.

34.   After the light turned green, Agent Skipper observed the Altima go straight through the intersection on Clairmont Way rather than turn left as the vehicle had indicated with its turn signal, and he followed the Altima through the green light onto Clairmont Way. T. at 35.

35.   Agent Skipper tried to put more space between the vehicles and then observed the Altima make a left turn "very quickly," and realized that the Altima had turned into a cul-de-sac. T. at 36.

36.   Agent Skipper followed the Altima onto the cul-de-sac and activated his blue lights on his vehicle, at which time the Altima got to the bottom of the cul-de-sac, and then "cut his wheels sharply like he was going to come back past me," and "appeared to speed up." T. at 38-39, 53.

37.   Agent Skipper then blocked the Altima with his vehicle, rolled his window down, pulled his weapon, pointed it at the driver and ordered him out of the vehicle. T. at 39.

38.   Agent Skipper does not speak Spanish and spoke to the driver in English when he ordered him to get out of the Altima. T. at 54.

39.   Agent Skipper shouted at the driver two or three times before the driver opened the door and got out of the Altima. T. at 39.

40.   After the driver exited the Altima, Agent Skipper observed that he was looking all around and Agent Skipper believed he was "looking all around like looking for a place to run to." T. at 39.

41.     Agent Skipper also got out of his vehicle at the same time as the driver; Agent Skipper moved quickly to the back of his vehicle and ordered the driver to the ground, and the driver complied. T. at 39.

42.     Agent Skipper testified that the driver of the Altima on August 13, 2010 is Defendant Daniel Benavides-Garcia. T. at 40-41.

43.     Around the time that Agent Skipper ordered Defendant to get on the ground, Agent Tim Tolbert drove up. T. at 39.

44.     After Defendant got on the ground, Agent Skipper placed handcuffs on him for the purpose of placing him under arrest for fleeing, attempting to elude, obstructing an officer. T. at 41.

45.     Shortly after Agent Skipper had placed handcuffs on Defendant, Trooper Carlisle showed up on the scene. T. at 41.

46.     Agent Skipper patted Defendant down and found a cell phone and a billfold on his person. T. at 41.

47.     Agent Skipper then went through the Defendant's billfold and found identification indicating that he was from the state of Michoacan, Mexico. T. at 41.

48.     Agent Skipper had previous information obtained during the investigation that the source of the drugs was related to La Familia Michoacan drug cartel, and the CS had done business with La Familia for years and had been to Michoacan to visit members of the organization. T. at 42.

49.     Agent Skipper then performed a "cursory" and "plain view" search of the vehicle's interior and noticed a cell phone on the console area near the gear shift, and retrieved the phone from the vehicle. T. at 42-43.

50.     According to Agent Skipper, Agent Tolbert later informed him that the agents who were with the CS at the hotel called the telephone number that they had been using to contact the person who was to deliver the drugs, and the cell phone retrieved from the interior of the Altima had that telephone number and "actually went off." T. at 43, 62-63, 90-91.

51.     Agent Skipper did not observe the Altima commit any traffic violation or offense; he testified that he stopped the Altima because he believed that the

driver was engaged in counter surveillance and had identified him as a law enforcement agent. T. at 52.

52.   Agent Skipper believed that the slow driving of the Altima, and the use of the left turn signal before proceeding straight through an intersection were signs that the driver of the Altima was conducting counter surveillance. T. at 52.

53.   Agent Skipper testified that, in his experience, narcotics traffickers routinely implement counter-surveillance measures against law enforcement. T. at 59.

54.   According to Agent Skipper, one of the most common counter-surveillance tactics is to travel slower than surrounding traffic so that every vehicle has to pass the slower vehicle, and that would make any law enforcement agent who was trying to follow behind the vehicle stand out. T. at 59.

55.   Trooper Stanley Kent of the Georgia State Patrol works with the criminal interdiction unit that assists the DEA and other law enforcement agencies, and he has obtained special training to be certified as a K-9 handler. T. at 64-66.

56.   Trooper Kent and his dog Misty have been certified together as a team to conduct "open air K-9 sniffs," which involve him starting the dog out in front

12

of the vehicle, allowing her to get used to the traffic going by, and then working the dog all around the vehicle in a "W sweeping" pattern, which may involve going around the vehicle three or four times. T. at 67-68.

57. Trooper Kent's dog Misty is certified to detect odors from cocaine, marijuana, methamphetamine and heroin. T. at 75-76.

58. Trooper Kent was also involved in the narcotics investigation that was conducting the buy-bust operation at the Marriott hotel on August 13, 2010, and he was there in his role as a K-9 handler. T. at 68.

59. Trooper Kent was parked across the street from the Marriott hotel in a parking garage, in the same general area where Trooper Carlisle was parked. T. at 68.

60. Trooper Kent heard over the radio that the suspect had been identified and that his vehicle was traveling away from the meet location. T. at 69.

61. Trooper Kent heard over the radio that the vehicle was on Century Parkway, and had crossed over Clairmont Road, but then the radio traffic became "garbled and staticy and unreadable at that point." T. at 69.

62.    Among the troopers present, only Trooper Kent had a vehicle-mounted radio that had the best reception, and he wanted to get closer to the vehicle so he could hear and relay radio transmissions. T. at 70.

63.    Trooper Kent then drove out of the parking garage, drove down Century Parkway through the intersection with Clairmont Road, and arrived at the cul-de-sac to find that Trooper Carlisle was already there, along with Agent Skipper and the suspect vehicle. T. at 70-71.

64.    According to Trooper Kent, the time that passed between the time he initially lost radio contact and left the parking garage, to the time he arrived at the cul-de-sac, was no longer than eight minutes. T. at 71, 81-82.

65.    Trooper Kent did not observe the stop of the Altima, and when he arrived the Defendant was already out of the vehicle and in custody. T. at 82.

66.    When Trooper Kent arrived on the scene at the cul-de-sac, the doors of the Altima were open and the officers were trying to find identification for the suspect, and he assisted the search for the suspect's wallet in the vehicle. T. at 71, 82.

67.   Agent Skipper asked Trooper Kent to conduct an open-air K-9 sniff of the Altima to determine whether any narcotic odor was coming from the vehicle. T. at 72.

68.   Trooper Kent and his dog Misty then conducted the open-air K-9 sniff of the vehicle, and Misty showed particular interest in the undercarriage of the vehicle, which Trooper Kent testified was not normal for a dog to do that when a vehicle was hot like the Altima was at that time. T. at 74-76.

69.   Based on his training as a K-9 handler and Misty's behavior, Trooper Kent had no doubt that Misty had detected the odor of narcotics while outside the Altima. T. at 85.

70.   Trooper Kent then opened up the rear door of the vehicle to let Misty inside the vehicle and she "immediately" jumped into the front seat and started working on the dashboard area; Misty ultimately alerted on the center console area right below the gear shift. T. at 77.

71.   Trooper Kent then informed Trooper Carlisle that Misty alerted on the center console area, which prompted Trooper Carlisle to open up the door to the Altima and start doing a search of the vehicle. T. at 78.

15

72.    Trooper Kent put Misty back into his vehicle, and retrieved a few tools, including a flashlight and a trim tool, which is a device used to pull plastic trim pieces from vehicles in order to prevent damage to the vehicle. T. at 78-79.

73.    Trooper Kent began a search of the interior of the vehicle, starting at the center console area, and worked his way down popping off the trim pieces. T. at 79.

74.    While removing the plastic trim pieces around the gear shift, Trooper Kent noticed that the spring clips holding the plastic panels were extremely loose, which indicated to him that the plastic panel had been removed many times, because the more times the panels are removed, the looser the spring clips get. T. at 79-80.

75.    After Trooper Kent removed the plastic panels, he noticed "heavy two-way tooling" on the bolts holding the shifter mechanism, which were marks that he believed indicated that damage had been done to the nut as it had been taken on and off. T. at 80-81.

76.    After Trooper Kent loosened those nuts, he found a hidden compartment underneath the shifter mechanism where he discovered several containers of suspected methamphetamine. T. at 81.

77.     Trooper Kent testified that, when he placed Misty inside the Altima, it was no

longer a "free-air" K-9 sniff. T. at 83.

## DISCUSSION

I.      The Stop of the Vehicle Was Based on Reasonable Suspicion of Criminal

Activity.

In his Motion to Suppress, Defendant requests that the Court suppress all

evidence obtained during the search of the Altima on August 13, 2010. In support of

the Motion to Suppress, Defendant first argues that the initial stop of the Altima was

illegal because the agents did not have a reasonable, articulable suspicion that he had

engaged in, or was about to engage in, any criminal activity.

As the Supreme Court has held, "[a] person is seized by the police and thus

entitled to challenge the government's action under the Fourth Amendment when the

officer, by means of physical force or show of authority, terminates or restrains his

freedom of movement." *Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007) (internal

quotes omitted) (*quoting Florida v. Bostick*, 501 U.S. 429, 434 (1991) (*quoting Terry

v. Ohio*, 392 U.S. 1, 19, n.16 (1968))).  Nevertheless, while Defendant may have been

subjected to a seizure under the Fourth Amendment, it does not mean that the seizure

was unlawful because the Fourth Amendment only prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.

The Supreme Court has held that a brief detention of a person may be justified if the Government can establish that the police officers had a reasonable suspicion based on articulable facts that such person may have engaged in illegal activity.  *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-21 (11th Cir. 1993); *United States v. Williams*, 876 F.2d 1521, 1523 (11th Cir. 1989).  A "reasonable suspicion" requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21.  Reasonable suspicion can be based on the "totality of the circumstances" and law enforcement personnel may draw on their experience and training to make inferences and deductions about the likelihood of criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989).

Based on the totality of the circumstances in this case, the Court finds that the Government has established that Agent Skipper had a reasonable suspicion that Defendant had engaged in, or was about to engage in criminal activity when Agent Skipper stopped the vehicle Defendant was driving on August 13, 2010. Defendant

argues that "all that the agents knew what [sic] that a car, which did not match the description of the vehicle given by the CS, had pulled into the hotel, turned around, and left." Def. Br. [25] at 7. The undersigned finds that, based on the evidence presented at the hearing, the agents knew considerably more than that, and had a reasonable suspicion that Defendant was the individual known as "Gallito" who had been in contact with the CS by telephone and who agreed to deliver methamphetamine to the CS at the Marriott hotel on Century Parkway.

As set forth in the Findings of Fact ("FOF" above, the collective knowledge of the officers and agents involved in the buy-bust operation included the following pieces of information: The CS had been in contact with an individual known as "Gallito" (or "Rooster") over the telephone and had requested between five and ten pounds of crystal methamphetamine, and Gallito agreed to the request and agreed to meet the CS at the Marriott hotel on Century Boulevard. FOF 4 and 5. The CS gave Gallito a room number at the hotel in which to meet. FOF 5. The CS told the agents that Gallito usually drives an F-150 pickup truck or a black Nissan Altima, and that they had met in hotel rooms previously to conduct drug transactions. FOF 7 and 8. At around 3:30 in the afternoon on August 13, 2010, Gallito called the CS and said, "hey, I should be there shortly. I should be there [in] around twenty minutes," and Gallito

asked the CS for specific directions to the hotel. FOF 9. Around 3:40 p.m., there was a phone call between the CS and Gallito in which the CS asked Gallito "are you here?" and Gallito responded, "I should be there in a little bit." FOF 14. There was very little traffic in the hotel parking lot that day. FOF 13. Shortly thereafter, a green Nissan Altima entered the parking lot of the Marriott hotel, drove through the parking lot very slowly, made a U-turn, slowed down even more, and then exited the parking lot. FOF 16.

After the Altima left the parking lot, Agent Skipper followed him and, after calling out the tag number over the radio, learned that the vehicle was registered to a Hispanic male. FOF 28. Agent Skipper observed that the Altima was traveling "very slowly, much slower than the rest of the traffic, probably 10 or 15 miles an hour." FOF 29. Agent Skipper decided he had to pass the Altima to avoid detection and as he did, he looked at the driver, and gave the description of the driver of the Altima over the radio as a young light-skinned Hispanic male with a white t-shirt and a short, but not overly short, haircut. FOF 30-31. The CS confirmed that the description of the driver of the Altima matched the description of Gallito, the person he had spoken to over the telephone, and the person he was expecting to deliver the drugs to the hotel room. FOF 32. The driver of the Altima used his left turn signal to indicate that he was

20

going left through the intersection with Clairmont Way, but after the light turned green, he proceeded straight through the intersection, made a left turn "very quickly," and turned into a cul-de-sac. FOF 33-35. After Agent Skipper followed the Altima onto the cul-de-sac, he activated the blue lights on his vehicle. FOF 36. In response, the driver of the Altima "cut his wheels sharply like he was going to come back past me" and "appeared to speed up." FOF 36. Agent Skipper then stopped the Altima and ordered Defendant out of the car and onto the ground. FOF 37.

In sum, the Court disagrees with Defendant that all that the agents knew was that a car that "did not match the description of the vehicle given by the CS, had pulled into the hotel, turned around, and left." Def. Br. [25] at 7. While Defendant is correct that the CS told the agents that Gallito drove a black Nissan Altima, not a green Nissan Altima, the undersigned finds that the difference in color is not fatal to a finding that the agents had reasonable suspicion of criminal activity when the totality of the circumstances in this case provided a high degree of likelihood that Defendant was Gallito, the person coming to the Marriott to deliver drugs to the CS. It was not merely the fact that Defendant was driving an Altima, although that was certainly a significant factor leading to reasonable suspicion. Gallito had just informed the CS over the telephone that he would be at the hotel " in a little bit," and shortly thereafter

Defendant drove his Altima into the parking lot, drove through it very slowly, made a U-turn, and then exited the parking lot. The undersigned takes judicial notice of the fact that a parking lot is generally designed for the purpose of *parking*; the Defendant's decision to drive slowly around the parking lot and then exit added to the suspicious circumstances, on a day when there were not many vehicles coming in and out of the parking lot.

Furthermore, Agent Skipper did not stop the Altima immediately after Defendant exited the parking lot. Agent Skipper instead passed the Altima and looked at Defendant and radioed a description of him to the agents who were with the CS, and the CS confirmed that the description of the driver of the Altima matched the description of Gallito, the person he had spoken to over the telephone and was expecting to deliver the drugs to the hotel room. Thus, not only was the vehicle that Defendant was driving the exact make and model that the CS had identified (although not the exact color), but the physical description of Defendant, although limited (young light-skinned Hispanic male with a short haircut, FOF 31), also matched the description of Gallito. Defendant argues that the description of Gallito was "so vague as to not actually amount to a description at all," but the Court finds that the

description, while not particularly specific, was sufficient enough to be one of the factors supporting a reasonable suspicion.

Defendant also argues that his driving around the parking lot and then exiting could have indicated that he was merely lost. If so, he was very unlucky to be a young light-skinned Hispanic male with a "short, but not overly short, haircut" driving a Nissan Altima into the Marriott parking lot at the exact moment that the agents were expecting a delivery of methamphetamine from a young light-skinned Hispanic male with a "short, but not overly short, haircut" driving a Nissan Altima into that Marriott parking lot. Perhaps Defendant is correct in speculating that his behavior could indicate that he was merely lost; lost and extremely unlucky, but still lost. Nevertheless, it was also Defendant's own behavior that led to the reasonable suspicion, not merely the unfortunate coincidence that the agents expected a young light-skinned Hispanic male driving a Nissan Altima to arrive with a delivery of methamphetamine at the Marriott parking lot at the exact moment that the Defendant, matching that description, drove his Altima into the Marriott parking lot.

After Defendant drove out of the Marriott parking lot, Agent Skipper observed Defendant using what Agent Skipper described as common "counter surveillance" tactics to avoid or evade law enforcement. Agent Skipper noticed that the Altima was

23

traveling "very slowly, much slower than the rest of the traffic, probably 10 or 15 miles an hour." Defendant also used his left turn signal to indicate that he was going left through the intersection with Clairmont Way, but after the light turned green, he proceeded straight through the intersection, after which he made a left turn "very quickly," all of which Agent Skipper considered to be counter surveillance maneuvers to determine whether he was being followed by law enforcement agents, or to elude them. FOF 29, 33-35.

All of this information considered together constitutes specific and articulable facts, which, together with rational inferences therefrom, are sufficient to create a reasonable suspicion that Defendant was Gallito, the person who was coming to the Marriott to deliver drugs to the CS. Thus, the undersigned concludes that Agent Skipper had a reasonable suspicion that the Defendant had engaged in criminal activity, or was going to engage in criminal activity, that justified the activation of his blue lights and his initial attempt to stop Defendant's vehicle.

II.    The Defendant's Arrest Was Based on Probable Cause.

Although Agent Skipper had a reasonable suspicion that authorized a brief detention of the Altima for investigatory purposes, it is undisputed that he did not

24

merely stop the Altima to ask the Defendant a few questions. As set forth above, Agent Skipper ultimately ordered Defendant out of the Altima, ordered him to get on the ground, and handcuffed him. Defendant argues that his arrest was unlawful because it was not based on probable cause.

For their own personal safety, police officers may draw their weapons and handcuff suspects during a *Terry* stop without necessarily transforming the stop into a *de facto* arrest requiring probable cause. *See United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-21 (11th Cir. 1993); *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985). Patting a suspect down for weapons and asking him to identify himself is "a reasonable, and not overly intrusive, way to investigate [the police officer's] suspicion of criminal activity." *Diaz-Lizaraza*, 981 F.2d at 1221; *see also United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987) (independent of any justification to search for evidence of criminal activity, a law enforcement officer has a right to conduct a limited search for weapons when he has a reasonable belief that he is in danger).

In this case, the Government argues that Defendant was not actually under arrest at the time that Agent Skipper ordered him on the ground and handcuffed him. According to the Government, "Defendant's detention ripened into an arrest only after

25

TFO Skipper determined that he had a Michoacan ID, and the phone in plain view in

the Altima matched the phone used to negotiate the fictitious drug deal." Gov. Br. [26]

at 23. Thus, the Court must determine whether the detention of Defendant was so

prolonged that it ripened from a lawful *Terry* stop into a *de facto* arrest, which would

require probable cause. *See United States v. Acosta*, 363 F.3d 1141, 1145-46 (11th

Cir. 2004).  As the Eleventh Circuit has explained:

> There is a difference between an investigative stop of limited duration
> for which reasonable suspicion is enough, and a detention that amounts
> to an arrest for which probable cause is required.  The difference is one
> of extent, with the line of demarcation resulting from the weighing of a
> "limited violation of individual privacy involved against the opposing
> interests in crime prevention and detection and in the police officer's
> safety." *Dunaway v. New York*, 442 U.S. 200, 209, 99 S. Ct. 2248, 2255,
> 60 L.Ed.2d 824 (1979); *see also United States v. Puglisi*, 723 F.2d 779,
> 785 (11th Cir.1984).

*Id.*

In distinguishing a true investigative stop from a *de facto* arrest, a court must

not adhere to "rigid time limitations" or "bright line rules," but must use "common

sense and ordinary human experience." *United States v. Hardy*, 855 F.2d 753, 759

(11th Cir. 1988) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)); *see*

*United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000); *United States v. Blackman*,

66 F.3d 1572, 1576 (11th Cir. 1995); *United States v. Hastamorir*, 881 F.2d 1551,

1556 (11th Cir. 1989). The factors that should be considered in distinguishing an investigative stop from an arrest include "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *Hardy*, 855 F.2d at 759; *see also Sharpe*, 470 U.S. at 685-686; *Acosta*, 363 F.3d at 1146. An investigatory stop does not become an arrest merely because a reasonable person would believe he was not free to leave; indeed, even handcuffing a suspect, by itself, does not automatically convert an investigative stop into an arrest. *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985); *see also Blackman*, 66 F.3d at 1576; *Hastamorir*, 881 F.2d at 1557.

Contrary to the Government's argument that the Defendant was not under arrest when the handcuffs were placed on him, and that he was not actually arrested until Agent Skipper had found his identification, Agent Skipper testified that, at the time he put handcuffs on the Defendant, he was placing Defendant under arrest. R. at 41. In describing his activities that are shown on the video recording of the incident, Agent Skipper testified as follows:

> Q. Okay. Can you describe for the Court what you are doing at this moment?
> A. I'm hand – I'm placing handcuffs on Mr. Garcia.

Q. And why are you doing that?

A. At that point he was under arrest for fleeing, attempting to elude, obstructing an officer.

T. at 41.

Thus, Agent Skipper's testimony indicates that he believed he had placed Defendant under arrest at the time he placed the handcuffs on him, while the Government argues that Agent Skipper did not actually arrest Defendant until after Agent Skipper had searched his wallet for identification and discovered that he was from the state of Michoacan, Mexico. Agent Skipper had previous information obtained during the investigation that Gallito was related to La Familia Michoacan drug cartel, and the CS had been to Michoacan to visit members of the organization. Thus, the Government argues, this additional piece of information, when added to all the other circumstances described above, provided probable cause to arrest Defendant.

The undersigned concludes that it is not necessary to determine whether, as a matter of law, Defendant was actually arrested at the time Agent Skipper handcuffed him, or was arrested after Agent Skipper found the Michoacan identification in his wallet. In either scenario, the undersigned finds that the Defendant's arrest was lawful because it was supported by probable cause.

28

An officer has probable cause to make an arrest when the totality of the facts and circumstances known at the time of the arrest is adequate to justify a reasonable belief that the person arrested had committed or was committing a crime. *See Beck v. Ohio*, 379 U.S. 89, 92 (1969). In assessing probable cause, courts may look to the collective knowledge of the law enforcement officers involved so long as they maintain some level of communication during the investigation leading to the arrest. *See United States v. Willis*, 759 F. 2d 1486, 1494 (11th Cir. 1985).

In consideration of all the facts and circumstances in this case, as described in detail above, the undersigned concludes that, not only did Agent Skipper have a reasonable suspicion that Defendant had engaged in criminal activity, but he also had probable cause to support a reasonable belief that Defendant had committed, or was committing a crime. According to Agent Skipper's testimony, he placed Defendant under arrest for "fleeing, attempting to elude, obstructing an officer," not for drug trafficking. It is undisputed that, at the time Agent Skipper placed the handcuffs on Defendant, he was not aware that Defendant was actually in possession of any drugs. Nevertheless, the totality of the circumstances supports Agent Skipper's reasonable belief that Defendant had engaged in criminal activity, or was engaging in criminal activity.

Agent Skipper had a reasonable articulable suspicion that justified a brief detention of Defendant when he activated his blue lights. When Defendant responded by appearing to turn out of the cul-de-sac and speed up, the agent had probable cause to arrest him, as he did for "fleeing, attempting to elude, obstructing an officer." Further, that apparent attempt to flee added sufficient additional circumstances to Agent Skipper's reasonable suspicion to elevate it to constitute probable cause to believe that the driver of the Altima he had followed was likely Gallito, and that the Altima contained evidence of criminal activity.

III.    The Search of the Vehicle Was Supported by Probable Cause.

Defendant next argues that the cell phone and drugs that were discovered during a search of the Altima were seized in violation of his Fourth Amendment rights and thus must be suppressed. To prevail on a claim that evidence was seized in violation of his Fourth Amendment rights, a defendant first bears the burden of demonstrating his legitimate and reasonable expectation of privacy in the areas searched. *United States v. Baron-Mantilla*, 743 F.2d 868, 869 (11th Cir. 1984) (*citing Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)). The legitimacy of a defendant's privacy interest is determined by the totality of circumstances surrounding the defendant's relationship with the place or item searched. *Baron-Mantilla*, 743 F.2d at 870; *see also Rakas*, 439

30

U.S. at 152 ("The ultimate question . . . is whether one's claim to privacy from governmental intrusion is reasonable in light of all the surrounding circumstances.").

In the instant action, the Government does not dispute that Defendant had a reasonable expectation of privacy as to the Altima and any items found in the vehicle. Accordingly, the Court will assume for the purpose of this discussion that the Defendant had a legitimate and reasonable expectation of privacy as to the items found in the Altima.

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy.  U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Place*, 462 U.S. 696, 706-07 (1983). Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989); *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

Warrantless searches are *per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *Payton*

31

*v. New York*, 445 U.S. 573, 603 (1980); *Katz v. United States*, 389 U.S. 347 (1967). Because a warrantless search or seizure is presumptively invalid, the burden is ordinarily on the Government to establish by a preponderance of the evidence that a particular exception to the warrant requirement applies. *Lego v. Twomey*, 404 U.S. 477 (1972); *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). Under the doctrine commonly known as the exclusionary rule, evidence is inadmissible if it is obtained through a search and seizure that is conducted without a warrant and is not subject to one of the specific exceptions to the warrant requirement. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

The Supreme Court has emphasized that the Fourth Amendment protects only against *unreasonable* police intrusion into privacy, and accordingly, the touchstone of a court's inquiry must be whether, under the totality of the circumstances, the police acted reasonably in conducting a search. *See United States v. Chadwick*, 433 U.S. 1, 9 (1977) ("Our fundamental inquiry in considering Fourth Amendment issues is whether or not a search is reasonable under all the circumstances."), *overruled on other grounds by California v. Acevedo*, 500 U.S. 565 (1991); *accord Hill v. California*, 401 U.S. 797, 803-04 (1971). To put it another way, the scope of an individual's Fourth Amendment rights against intrusion may not be measured in a

vacuum, but must be considered in light of what information is reasonably available to police and in light of the magnitude of the intrusion. This point was made most emphatically in *Illinois v. Rodriguez*, 497 U.S. 177 (1990), in which the Supreme Court held that a good-faith, reasonable mistake as to the extent of an occupant's access to a home (and thus her right to consent to a search of the home) did not require suppression of the fruits of the search. As the Court stated in *Rodriguez*:

> It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government – whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement – is not that they always be correct, but that they always be reasonable.

*Id.* at 185; *see also Hill*, 401 U.S. at 804 (when arrest was based on probable cause, but later turns out to be erroneous, evidence seized incident to that arrest is not subject to suppression so long as officers' decision to make arrest was "a reasonable response to the situation facing them at the time"). As *Rodriguez, Hill,* and their progeny make clear, a court may not apply hindsight to second-guess the reasonableness of a search based on after-acquired information that could not have been known to police at the time.

One well established exception to the warrant requirement is the "automobile exception." The Supreme Court has held that, due to the mobility of vehicles, they may be searched without a warrant if the officers have probable cause to believe that the vehicle contains contraband or evidence of a crime. *Carroll v. United States*, 267 U.S. 132, 149 (1925). If probable cause exists to search an operational automobile, no additional exigent circumstances need be present in order to conduct a legal search of a vehicle without a warrant. *Maryland v. Dyson*, 527 U.S. 465, 466-467 (1999). Accordingly, the warrantless search of a vehicle has been held reasonable if supported by probable cause, even if the vehicle has been removed to the security of a police department lot. *United States v. Johns*, 469 U.S. 478 (1985)*; Chambers v. Maroney*, 399 U.S. 42 (1970). Finally, the right to conduct a warrantless search of a vehicle has been held to extend to the search of any containers found within the vehicle that may conceal the subject of the search. *United States v. Ross*, 456 U.S. 798 (1982).

In this case, it is undisputed that the agents did not have a warrant to search the Altima at the time they searched it and discovered the cell phone and the illegal narcotics. Thus, under the automobile exception, the seizure of the items found during the search was lawful only if the agents had probable cause to believe that the automobile contained contraband or evidence of a crime. *Ross*, 456 U.S. at 804-809.

34

Probable cause to search "exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be discovered in a particular place." *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996). "[T]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir.1982).

Probable cause may be found to search a particular area where law enforcement officers seek to search that location based on their common sense and experience as to where persons selling drugs might conceal contraband. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 230-231 (1983); *United States v. Jenkins*, 901 F. 2d 1075, 1081 (11th Cir. 1990). "The principal components of a determination of . . . probable cause will be the events which occurred leading up to the . . . search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount . . . to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). The determination of probable cause also rests on the "the facts and circumstances within the *collective knowledge* of law enforcement officers, or of which they may have reasonably trustworthy information." *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (emphasis added).

The Court finds that, considering the collective knowledge of the agents involved in this investigation as discussed in detail above, the agents had probable cause to believe that the Altima may have contained illegal drugs or other evidence of drug trafficking. Based on the totality of the circumstances in this case, including that: Gallito had agreed to sell the CS a quantity of methamphetamine and the CS and Gallito had agreed to meet at the Marriott hotel for the transaction; Defendant matched the description of Gallito; Defendant drove the same make and model of automobile that the CS said Gallito often drove; Defendant drove into the Marriott parking lot just minutes after Gallito told the CS via telephone, "I should be there in a little bit," then drove around the parking lot slowly and left; Defendant committed several maneuvers that Agent Skipper believed to be counter-surveillance tactics, and Defendant ultimately appeared to try to flee when Agent Skipper activated his blue lights, the undersigned finds that Agent Skipper and the other agents had probable cause to believe that illegal drugs or other evidence of drug trafficking may be found in the Altima.

Armed with probable cause and knowing that Gallito had been in touch with the CS by telephone, when Agent Skipper saw the cell phone inside the Altima he had good reason to think that the cell phone might be evidence of a crime. His seizure of

the cell phone from the console would also fall under the "plain view" exception to the warrant requirement. Agent Skipper testified that he looked into the vehicle, saw the cell phone on the console area near the gear shift in plain view, and retrieved the phone from the vehicle. Because the item was in plain view, and Agent Skipper was lawfully in the area when he saw it, he was entitled to seize the cell phone at that time even before Misty alerted that drugs may be present in the vehicle. *See United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (an "officer may seize any contraband, including weapons, in plain view.").

Furthermore, Trooper Kent's testimony indicates that, before the Altima was searched for items not in plain view, Misty, his K-9 companion certified to detect odors from cocaine, marijuana, methamphetamine and heroin, alerted the agents to the presence of a narcotics odor in the Altima. According to the testimony of Trooper Kent, Misty showed particular interest in the undercarriage of the vehicle, which Trooper Kent testified was not normal for a dog to do that when a vehicle was hot like the Altima was at that time. From Misty's behavior outside the Altima, Trooper Kent had no doubt that Misty had detected the odor of narcotics in the vehicle. FOF 69. Trooper Kent then opened up the rear door of the vehicle to let Misty inside the vehicle and she "immediately" jumped into the front seat and started working on the

dashboard area, and ultimately alerted on the center console area right below the gear shift. It is well settled that a drug-trained dog may conduct an open-air sniff without probable cause and that "probable cause arises when a drug-trained canine alerts to drugs." *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006) (quoting *United States v. Banks*, 3 F.3d 399, 402 (11th Cir.1993)); *see also United States v. Dunkley*, 911 F.2d 522, 527 (11th Cir. 1990); *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984).

For all these reasons, the undersigned finds that the agents had sufficient reason to believe that there was a "fair probability" that illegal drugs were in the Altima. Thus, the search of the Altima was supported by probable cause.

Defendant nevertheless argues that no probable cause existed to support the search of the Altima, and also argues further that the search of the vehicle was not a lawful search incident to the Defendant's arrest, pursuant to the Supreme Court's holding in *Arizona v. Gant*, 129 S. Ct. 1710 (2009). The Court agrees with Defendant that, had the Government attempted to justify the search of the Altima as a search incident to arrest, that argument would likely not have held up to scrutiny. *See Arizona v. Gant*, 129 S. Ct. 1710, 1716 (2009) ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for

the search-incident-to-arrest exception [protecting officers' safety and safeguarding evidence of the offense the arrestee might conceal or destroy] are absent and the rule does not apply."). The Government has not argued that the search of the Altima was a valid search incident to arrest, however, and instead argues that the search was supported by probable cause pursuant to the automobile exception of the warrant requirement. For all the reasons discussed above, the undersigned agrees.

IV.   The K-9 Search Was Lawful.

Defendant's final argument is that the K-9 search of the Altima was not supported by probable cause. Defendant concedes that a K-9 drug sniff performed during a lawful traffic stop is not a search implicating Fourth Amendment concerns. *United States v. Tamari*, 454 F.3d 1259, 1265 n.6 (11th Cir. 2006) (*citing Illinois v. Caballes*, 543 U.S. 405, 410 (2005)). Defendant argues, however, that the stop of the Altima was not a "lawful traffic stop" and thus the drug sniff was not lawful. For the reasons discussed above, the undersigned rejects this argument and finds that the initial detention of the Altima was lawful because it was based on reasonable suspicion, and the Defendant's arrest was lawful because it was supported by probable cause. Thus, the original "open-air sniff" conducted by the team of Trooper Kent and Misty was lawful and did not violate the Defendant's Fourth Amendment rights. *See*

*United States v. Place*, 462 U.S. 696, 707 (1983) (use of a "canine sniff" by a trained narcotics dog is not a search within the meaning of the Fourth Amendment because it is much less intrusive than a typical search); *Hearn v. Bd. Pub. Educ.*, 191 F.3d 1329, 1332 (11th Cir. 1999) ("A dog sniff of a person's property located in a public place is not a search within the meaning of the Fourth Amendment.").

Moreover, once Misty alerted to the presence of drugs in the Altima, that provided even further probable cause for a thorough search of the vehicle. See *Tamari*, 454 F.3d at 1265. Accordingly, the undersigned rejects the Defendant's argument that the K-9 search was not lawful because it was not supported by probable cause and finds that the search was conducted lawfully.

## RECOMMENDATION

For all the above reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [15] be **DENIED**.

**IT IS SO RECOMMENDED** this 28th day of March, 2011.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE